# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs May 5, 2009

## STATE OF TENNESSEE v. LANDON  McCONAUGHY

**Direct Appeal from the Circuit Court for Madison County**
**No. 07-674     Donald Allen, Judge**

---

**No. W2008-01645-CCA-R3-CD  - Filed February 26, 2010**

---

The Defendant-Appellant, Landon McConaughy,[1] was arrested after a valid traffic stop, and various contraband was seized from his person and his vehicle.  He filed a motion to suppress all evidence seized as a result of the traffic stop, which was denied by the Madison County Circuit Court.  McConaughy subsequently pled guilty to possession of methamphetamine with intent to sell, a Class C felony, and possession of drug paraphernalia, and possession of a prohibited weapon, both Class A misdemeanors.  He received an effective sentence of five years.  Pursuant to Tennessee Rule of Criminal Procedure 37, McConaughy properly reserved three certified questions of law alleging violations of his rights under the Fourth Amendment of the U.S. Constitution and Article 1, Section 7 of the Tennessee Constitution: (1) "whether the scope of his detention following the traffic stop was exceeded by [the arresting officer], without reasonable suspicion or probable cause;" (2) "whether [the arresting officer] had sufficient reasonable suspicion that McConaughy was armed in order to justify a Terry style pat-down;" and (3) "whether [the arresting officer] exceeded the scope of a Terry pat-down."  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which THOMAS T. WOODALL and J. C. MCLIN, JJ., joined.

Daniel J. Taylor, Jackson, Tennessee, for the Defendant-Appellant, Landon McConaughy.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Jerry Woodall, District Attorney General; and Brian Gilliam, Assistant District Attorney General, for the Appellee, State of Tennessee.

---

[1]The Defendant-Appellant's name is spelled "McConaughy" in the indictment; however, his name is spelled "McConnaughy" throughout the motion to suppress transcript and other documents in the record on appeal.

# OPINION

**Suppression Hearing**. This case stems from the detention and arrest of McConaughy following a valid traffic stop on June 16, 2007. During the stop, a "spring-loaded" switch blade, a prohibited weapon, was removed from McConaughy's front pant's pocket, $864 in various denominations was found on his person, and methamphetamine, a glass pipe, and digital scales were found in his vehicle. McConaughy filed a motion to suppress conceding the traffic stop was supported by probable cause; however, he moved to suppress all evidence seized pursuant to the stop based on a variety of other grounds.

At the suppression hearing, Deputy Tony Valdez of the Madison County Sheriff's Department testified to the following events. Deputy Valdez was conducting stationary radar around 1:00 a.m. when he observed McConaughy's vehicle traveling forty-two miles per hour in a thirty miles per hour zone. Deputy Valdez pulled into a private driveway behind McConaughy, activated his emergency blue lights, and stepped out of his vehicle. Upon initial contact with McConaughy, Deputy Valdez informed McConaughy of the traffic violation and asked for his identification, registration of the vehicle, and proof of insurance.

Deputy Valdez stated McConaughy had his driver's license and vehicle registration, but no proof of insurance. During the initial contact, Deputy Valdez asked McConaughy "if there were any weapons or illegal or illicit type of narcotics" in the vehicle. Deputy Valdez said that McConaughy replied, "'No.' and further said, 'You can stick your head in here if you like.'" Deputy Valdez stepped away from McConaughy's vehicle to provide him time to look for proof of insurance in an effort to prevent an additional charge.

Upon returning to McConaughy's vehicle, Deputy Valdez's second contact with McConaughy, Deputy Valdez asked for McConaughy's insurance card again. Deputy Valdez also questioned for the second time, "Is there any illegal or illicit contraband or narcotics or weapons?" McConaughy replied, "'No.' and again he said, 'You can put your head in here and check it out.'" Deputy Valdez testified that this response "raised concern." Deputy Valdez said he began "the process for the citation itself" after his second contact with McConaughy. Deputy Valdez estimated the process for the citation lasted "probably about 20 minutes /15 minutes." In explaining the citation process, Deputy Valdez stated:

> In this case and mostly every case, we make sure there is no wants or warrants for the person and we have to wait for that information to return; make sure the vehicle is not wanted or there's no warrants for the vehicle as well. Once that information has returned, I'll complete a citation process and then we go ahead and explain to the violator what the infractions are and how they can remedy that by court process.

While Deputy Valdez processed the citation, McConaughy remained inside of his vehicle.

Deputy Valdez stated, "At that point after the citation was completed and I told him I was going to issue him a citation, I asked him to step out of the vehicle for my safety and step to the rear of his vehicle which was in front of my vehicle." Deputy Valdez testified that drivers are asked to step out of their vehicles for officer safety when

> The situation dictates and if I feel that the situation where I may be compromised because when I do recontact somebody and I do have the citation book in my hand and my hands are full, my position is compromised. In those cases, I do ask them to step out.

He explained that "in those cases" his safety is compromised because his hands are full. However, he stated, after he asked McConaughy to get out of the vehicle, his "cit book" was on the front hood of his vehicle. He asked McConaughy to step to the rear of his vehicle and again, for the third time, asked him if he had any weapons with him. At this point, Deputy Valdez testified that McConaughy said he had a knife.

Deputy Valdez told McConaughy "not to reach for it,"conducted a pat-down of McConaughy, and felt the impression of a knife. Deputy Valdez then removed a "spring-loaded" switch blade from McConaughy's front pants pocket, which Deputy Valdez concluded was an illegal weapon. McConaughy was placed into custody and held in the back of Deputy Valdez's vehicle. The passenger in McConaughy's vehicle was identified and eventually released. Deputy Valdez then conducted an inventory search of McConaughy's vehicle, which produced a small bag found in the trunk area of the vehicle that contained a glass methamphetamine pipe and digital scale. The small bag also contained a clear plastic baggy of 15.3 grams of methamphetamine.

On cross-examination, Deputy Valdez testified that after he stopped McConaughy, he determined that the vehicle was lawfully registered to McConaughy and that McConaughy possessed and owned the vehicle. However, the record does not show when Deputy Valdez confirmed this during the stop. Another deputy came to the stop location "some time before [Deputy Valdez's] initial contact and the first time [he] went to [his] vehicle to initiate the citation process[.]" Deputy Valdez explained the second officer was there for security while he wrote the citation. The second deputy stood "probably 20 feet" away from McConaughy.

Defense counsel asked, "Didn't [McConaughy] ask you why he couldn't sign the citation - - you couldn't hand him the citation?" In response, Deputy Valdez replied, "And my reasons were my officer safety, my safety. I don't know what his intentions were." The following exchange then occurred between defense counsel and Deputy Valdez:

-3-

DEFENSE COUNSEL:  You had already asked him twice about his weapons and he indicated he had no weapons or drugs, is that correct, before you asked him to step outside the vehicle?

DEPUTY VALDEZ: Yes.  That's what he indicated, yes.

DEFENSE COUNSEL: So you had no reason – he indicated to you there was no weapon; is that right?  Twice?

DEPUTY VALDEZ: He did.

DEFENSE COUNSEL: And nothing had changed since the first time you asked those two questions and then when you walked back a third time because [the second officer] was standing right there, wasn't he?

DEPUTY VALDEZ: He was, yes sir.

DEFENSE COUNSEL: So nothing had changed in that meantime?

DEPUTY VALDEZ: No, sir.  Not except for my awareness from the get-go. You know, you have to raise concern when someone tells you to stick your head in the vehicle, yes, sir.

Deputy Valdez acknowledged that he did not see or smell any drugs and had no indication of weapons.  He stated the purpose of asking McConaughy to step out of his vehicle was

For my safety.  Because of his comments, I don't know what his intentions were.  Since he was ceased (sic) and not free to leave, I would rather him come back to me where I can cover him and my partner can cover the passenger.

Defense counsel then asked, "[S]o his comment, the reason you asked him to step outside was because you asked him twice if he had a weapon or any drugs and he said, 'No.'?" Deputy Valdez replied, "No.  Because he responded twice to stick my head in the window, sir." Deputy Valdez acknowledged that he continued to ask McConaughy about weapons and drugs because of McConaughy's statement that he could stick his head in the window and look around, but denied having asked McConaughy to search his vehicle.

The passenger in McConaughy's vehicle, Anthony Allen, testified that the traffic stop took place in the driveway of his residence.  Allen stated that Deputy Valdez repeatedly

-4-

asked to search McConaughy's vehicle. Allen said McConaughy and Deputy Valdez "feuded" for between ten and fifteen minutes about whether Deputy Valdez had a right to search the vehicle. Allen stated that Deputy Valdez approached McConaughy's vehicle a second time with Officer Lipham. Allen testified that the officers said "metro was coming with a K-9." Allen also stated, "The whole time both of them had their flashlights and was looking through the windows of the car . . ." After McConaughy got out of his vehicle, Allen said he watched Deputy Valdez grab McConaughy's pockets; however, Allen could not hear their conversation. Allen testified that he was agitated during the traffic stop because "the officer acted like he didn't want to give [McConaughy] his ticket and let him go. He just kept on and kept on pushing the point to search the vehicle over and over. He asked him more than twice I know." Allen also stated they were in the vehicle thirty minutes before McConaughy was ordered out of the vehicle by the officers.

McConaughy testified that Deputy Valdez asked to search his vehicle at least eight to ten times. McConaughy said he responded "no" each time. McConaughy stated that Deputy Valdez and the second deputy walked around his vehicle several times with flashlights. McConaughy said he was told that "the K-9 unit was going to be coming out and the dog was going to sniff the car." McConaughy testified that when Deputy Valdez first approached his vehicle, he asked, "'Do you mind if we stick our heads in there and poke around?'" McConaughy responded, "'No. I didn't mind. Stick your head in here and poke around.'" McConaughy said Deputy Valdez ordered him outside of his vehicle to sign the citation. While outside, McConaughy said he was not asked if he had a weapon. He testified that when he attempted to sign the citation, the officers grabbed his arms and retrieved the knife from his pocket. McConaughy stated that he was not aware that he had a weapon in his pockets or narcotics in his trunk. McConaughy testified that he was in his vehicle for around forty-five minutes before being asked to sign the citation. He said he sat in his vehicle for between twenty and thirty minutes while Deputy Valdez asked to search his vehicle.

The trial court denied McConaughy's motion to suppress. In its written findings, the trial court stated:

> The Court credits the testimony of Deputy Tony Valde[z] who stated that he initiated a traffic stop of the defendant's vehicle after observing him speeding (42 mph in a 30 mph zone) at approximately 1:00 A.M. on June 16, 2007. The traffic stop was justified based upon the officer's personal observations. After the defendant was unable to show proof of insurance for his vehicle, the officer initially decided to issue citations for the speeding and proof of insurance violations. Following this lawful stop of the defendant's vehicle, the law clearly allows the officer to ask that the driver (or even a passenger) to exit the vehicle, especially since the officer needed to ask the

defendant to sign the traffic citation. Upon asking the defendant if he had any weapons on him, (which the officer indicated he did for his own personal safety) the defendant replied "yes," that he had a "pocket knife" in his pants pocket. This reply of "yes" is in direct contradiction to the defendant's earlier answers when asked that very same question by the officer while the defendant was seated in his vehicle. The defendant had twice told the officer earlier that he had no weapons on him while he was seated in his car. Based upon the circumstances, the Court finds that the "pat down" of the defendant for weapons at that point was justified since the defendant had affirmatively indicat[ed] that he had a knife on his person.

The "pat down" of the defendant by the officer led to the discovery of a spring loaded, switch blade knife which the officer testified was a prohibited weapon. The officer then immediately placed the defendant under arrest for carrying or possessing this prohibited weapon. The Court credits Deputy Valde[z]'s testimony in this regard. The Court does not credit the testimony of the defendant Landon McConaughy when he testified that he was placed under arrest <u>before</u> he was patted down by the officer.

Furthermore, the Court credits the testimony of Deputy Valde[z] when he testified that after placing the defendant under arrest and into custody, he conducted an inventory search of the vehicle prior to it being towed. The defendant even testified, the same as did Deputy Valde[z], that it only took about 20 minutes from the time his vehicle was stopped until the time he was placed under arrest. The Court finds that this was not an unreasonable amount of time to detain the defendant.

Following the denial of the motion to suppress, McConaughy pled guilty to possession of methamphetamine with intent to sell, possession of drug paraphernalia, and possession of a prohibited weapon. Pursuant to Tennessee Rule of Criminal Procedure 37, McConaughy reserved for appeal the following certified questions:

Whether the scope of the detention following the traffic stop was exceeded by Officer Valdez, without reasonable suspicion or probable cause, in violation of the Defendant's rights under both the Fourth Amendment of the U.S. Constitution and Article 1, Section 7 of the Tennessee Constitution.

Whether Officer Valdez had sufficient reasonable suspicion that Mr. McConaughy was armed in order to justify a Terry style pat-down of Mr. McConaughy under the Fourth Amendment of the U.S. Constitution and Article 1, Section 7 of the Constitution of Tennessee.

Whether Officer Valdez exceeded the scope of a Terry pat-down of Mr. McConaughy in violation of the Fourth Amendment of the U.S. Constitution and Article 1, Section 7 of the Constitution of Tennessee.

## ANALYSIS

**Standard of Review**.  The standard of review applicable to suppression issues involves a mixed question of law and fact.  State v. Garcia, 123 S.W.3d 335, 342 (Tenn. 2003).  "[A] trial court's finding of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise."  State v. Cox, 171 S.W.3d 174, 178 ( Tenn. 2005) (quoting  State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)).  The Tennessee Supreme Court explained this standard in State v. Odom:

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence.  So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld.

Odom, 928 S.W.2d at 23.  The trial court's application of the law to the facts is reviewed de novo.  State v. England, 19 S.W.3d 762, 766 (Tenn. 2000).

The Fourth Amendment to the United States Constitution and Article 1, Section 7 of the Tennessee Constitution protect against unreasonable searches and seizures.  In addition, "a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement."  State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).  The stop of a vehicle and the detention of its occupants constitutes a seizure within the meaning of both the Fourth Amendment to the United States and Article 1, Section 7 of the Tennessee Constitution.  Whren v. United States, 517 U.S. 806, 809-10, 116 S. Ct. 1769, 1772 (1996); State v. Binette, 33 S.W.3d 215, 218 (Tenn. 2000).  When the police have probable cause that a traffic violation has occurred, the decision to stop the vehicle is reasonable.  State v. Berrios, 235 S.W.3d 99, 105 (Tenn. 2007) (citing Whren, 517 U.S. at 810, 116 S. Ct. at 1772).  In this case, McConaughy concedes that the initial stop by Deputy Valdez was constitutional.

**I. Scope of Detention**.  McConaughy claims "the scope of the detention following the traffic stop was exceeded by Deputy Valdez, without reasonable suspicion or probable

cause . . ." Specifically, he asserts that the length and manner of his detention were unreasonable. The State argues the trial court correctly credited the testimony of Deputy Valdez in finding that McConaughy's detention was reasonable.

If an officer's action in stopping an individual is justified at its inception, then we must next determine whether the seizure and search of the individual are "reasonably related in scope to the circumstances which justified the interference in the first place." Terry v. Ohio, 392 U.S. at 20, 88 S. Ct. at 1879. The detention "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." Florida v. Royer, 460 U.S. 491, 500, 103 S. Ct. 1319, 1325 (1983). "[T]he proper inquiry is whether during the detention, the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." State v. Simpson, 968 S.W.2d 776, 783 (Tenn. 1998). If "the time, manner or scope of the investigation exceeds" the ambit of reasonableness, a constitutionally permissible stop may be transformed into one which violates the Fourth Amendment and article 1, section 7 of the Tennessee Constitution. United States v. Childs, 256 F.3d 559, 564 (7th Cir. 2001); see also State v. Morelock, 851 S.W.2d 838, 840 (Tenn. Crim. App. 1992); State v. Kevon Fly, No. E2006-01979-CCA-R3-CD, 2007 WL 2141543, at *5 (Tenn. Crim. App., at Knoxville, July 26, 2007). Furthermore, the reasonableness of the scope of a traffic stop is to be measured in objective terms without regard to the subjective intentions of the officer. Ohio v. Robinette, 519 U.S. 33, 38, 117 S. Ct. 417, 420-21 (1996).

In Tennessee, "requests for driver's licenses and vehicle registration documents, inquiries concerning travel plans and vehicle ownership, computer checks, and the issuance of citations are investigative methods or activities consistent with the lawful scope of any traffic stop." State v. Gonzalo Garcia, No. M2000-01760-CCA-R3-CD, 2002 WL 242358, at *21 (Tenn. Crim. App., at Nashville, Feb. 20, 2002) (citing United States v. West, 219 F.3d 1171, 1176 (10th Cir. 2000); United States v. Hill, 195 F.3d 258, 268 (6th Cir. 1999); and United States v. Lyton, 161 F.3d 1168, 1170 (8th Cir. 1998)), overruled on other grounds by State v. Garcia, 123 S.W.3d 335 (Tenn. 2003). With this in mind, however, when an officer observes certain misdemeanors, such as a operating a vehicle in excess of the speed limit, the officer shall issue a citation for the violation in lieu of arresting the misdemeanant. See T.C.A. §§55-8-152, -10-207(a)(1) (2007). "[T]he Tennessee 'cite and release' statute creates a presumptive right to be cited and released for the commission of a misdemeanor." State v. Walker, 12 S.W.3d 460, 464 (Tenn. 2000). Violating the "cite and release" statute infringes upon a person's right against an unreasonable search and seizure. Id. at 467.

Before engaging further in our analysis, we must first note that McConaughy's brief, in large part, only challenges Deputy Valdez's credibility. After comparing conflicts between Deputy Valdez, McConaughy, and Anthony Allen's testimony, McConaughy simply states "there was no reason to take [him] into custody." As previously stated,

"Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Odom, 928 S.W.2d at 23. The trial court credited the testimony of Deputy Valdez over that of McConaughy and Allen. The record does not preponderate against the findings of the trial court. Even without the credibility determination made by the trial court, McConaughy fails to state how Deputy Valdez exceeded the scope of the stop. We will, nevertheless, address McConaughy's claim in so much as he argues the scope of his original detention was exceeded by Officer Valdez's improper questioning.

After a considerable split of authority in the federal courts,[2] the United States Supreme Court resolved the issue of whether an officer is permitted to ask questions during a search unrelated to the purpose of the initial detention in Muehler v. Mena, 544 U.S. 93, 100-01, 125 S. Ct. 1465, 1471-72 (2005). Although the facts in Muehler were not based on a traffic stop, Muehler held that "mere police questioning does not constitute a seizure" unless it extends the detention of the individual. Id. (quoting Florida v. Bostick, 501 U.S. 429, 434, 111 S. Ct. 2382, 2386 (1991). Recently, in Arizona v. Johnson, 129 S. Ct. 781 (2009), the United States Supreme Court emphasized its holding in Muehler, and made clear that

> A lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation. The temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop. Normally, the stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave. See Brendlin, 551 U.S., at 258, 127 S. Ct. 2400. An officer's inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop. See Muehler v. Mena, 544 U.S. 93, 100-01, 125 S. Ct. 1465, 161 L.Ed.2d 299 (2005).

Id. at 788.

The record in this case is not altogether clear as to the time-line of events from the inception of the stop to McConaughy's arrest. There was no direct testimony regarding the

[2]See United States v. Holt, 264 F.3d 1215, 1228-29 (10th Cir. 2001), and United States v. Shabazz, 993 F.2d 431, 436 (5th Cir. 1993) (holding that questions during lawful traffic stop which are unrelated to initial stop do not violate Fourth Amendment); United States v. Murillo, 255 F.3d 1169, 1174 (9th Cir. 2001) and United States v. Ramos, 42 F.3d 1160, 1164 (8th Cir. 1994) (holding that questions are seizures requiring either some relation to the basis for the custody or an independent source of reasonable suspicion); see also Wayne R. LaFave, The " Routine Traffic Stop" From Start to Finish: Too Much "Routine," Not Enough Fourth Amendment, 102 Mich. L.Rev. 1843, 1887 (2004).

time period prior to Deputy Valdez's second contact, when the citation process actually began, or when Officer Valdez received confirmation of McConaughy's driving particulars. As such, it is extremely difficult for this court to determine whether the questions posed by Deputy Valdez exceeded the permissible scope of the stop. However, the record does show that Deputy Valdez did not begin the "citation process" until after the second contact with McConaughy, to save McConaughy from an additional charge. He explained that after the second contact he returned to his vehicle to complete the citation. The citation was complete within fifteen to twenty minutes, and Deputy Valdez returned to McConaughy's vehicle to initiate the third contact. During the third contact, Deputy Valdez ordered McConaughy out of his vehicle to sign the citation. Deputy Valdez testified that the purpose of ordering McConaughy out of his vehicle to sign the citation was for officer safety. In addition, McConaughy's statement, "you can stick your head in," raised Deputy Valdez's concern about the stop. Finally, similar to Deputy Valdez's testimony, the passenger in the vehicle testified that the "citation process" lasted approximately thirty minutes. Based on this record, we unable to conclude that Deputy Valdez's action, in asking three questions regarding weapons and narcotics, unreasonably exceeded the scope of the traffic stop. Compare State v. Orson Wendell Hudson, No. M2004-00077-CCA-R3CD, 2005 WL 639129, at **3-4 (Tenn. Crim. App., at Nashville, Mar. 15, 2005) (concluding that questions by officer were within the scope of original detention and did not create an unreasonable delay where officer initially asked for license, registration, insurance, and travel plans, but after noticing defendant's tail light was not working, asked defendant if he had been previously arrested and defendant admitted prior arrests for domestic battery and unlawful possession of a handgun) and Fly, 2007 WL 2141543, at *5-6 (concluding that there was nothing improper about scope or duration of the detention where questions by officer revealed that although defendant had been issued a valid driver's license, he did not have it with him at the time of the stop) with Maxwell v. State, 785 So. 2d 1277 (Fla. Dist. Ct. App. 2001) (holding that police officer unreasonably delayed writing speeding ticket, which gave drug sniffing dog unit time to arrive and search defendant's car, and officer asked defendant over 50 questions during stop, including where he had worked and questions about drugs and weapons, and where officer made no attempt to finish writing ticket once he had necessary information). McConaughy is not entitled to relief on this issue.

**II. Pat-Down Search.**[3]  McConaughy claims Deputy Valdez lacked reasonable suspicion that he was armed or dangerous to justify a pat-down search.  The State argues that the trial court correctly found that the pat-down search was warranted based on Deputy Valdez's testimony that McConaughy admitted to possessing a knife.

As a safety measure, an officer may generally request a motorist to exit his vehicle in order to sign a citation.  See Pennsylvania v. Mimms, 434 U.S. 106, 111, 98 S. Ct. 330, 333 (1977); State v. Harris, 280 S.W.3d 832, 840 (Tenn. Crim. App. 2008).  Once the motorist has exited his vehicle, the officer "may conduct a pat-down for weapons if he has reasonable suspicion that the driver may be armed."  Berrios, 235 S.W.3d at 108 (citing Knowles v. Iowa, 525 U.S. 113, 118, 119 S. Ct. 484, 488 (1998)).  Here, the trial court found that "the 'pat down' of the defendant for weapons . . . was justified since the defendant affirmatively indicated that he had a knife on his person."  This finding was based on the trial court's determination that Deputy Valdez was a credible witness.  We will not override the trial court's assessment of a witness' credibility.  See Odom, 928 S.W.2d at 23.  Based on Deputy Valdez's testimony, which is entitled to the strongest legitimate view, the pat-down search was justified because McConaughy admitted to carrying a weapon.  McConaughy is not entitled to relief on this issue.

**Conclusion.**  Based on the foregoing, the judgment of the trial court is affirmed.

_____
CAMILLE R. McMULLEN, JUDGE

---

[3]We presume McConaughy's brief combines his second and third certified questions because he fails to brief or provide any argument in regard to "[w]hether Officer Valdez exceeded the scope of a Terry patdown of Mr. McConaughy in violation of the Fourth Amendment of the U.S. Constitution and Article 1, Section 7 of the Constitution of Tennessee."  In so much as his third certified question is not comprised within the brief portion of his second certified question, we conclude that it is waived.  See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").